[No. 18357.    Department Two.    November 26, 1924.]

SKIBSAKTIESELSKAPET BESTUM III, *Appellant,* v.
JOHN P. DUKE, *as Supervisor of Banking,
et al., Respondents.*[1]

ESTOPPEL (28)— IN PAIS—INCONSISTENT CLAIMS—INTEREST IN CONTRACTS. Where contracts to build ships for foreign owners were repudiated by the owners because not authorized by the agent executing them, and the assignor of the contracts remained quiescent for.two and one-half years without claiming any interest while the construction had been taken over by others, the assignor is estopped to assert that the repudiation or annulment of the contracts was not final.

CONTRACTS (159)—BREACH—RIGHTS AND LIABILITIES ON PARTIAL PERFORMANCE. One claiming an interest in vessels constructed under an agreement requiring a bond guaranteeing performance, has no right to the sum deposited in lieu of a bond to secure payment for performance of the work, where there was a heavy deficit after applying the deposit, which was paid to the contractor.

APPEAL (389)—REVIEW—AMENDMENTS. Under Rem. Comp. Stat., § 1752, the supreme court will consider an answer amended to cure a defect that was capable of amendment.

[1]Reported in 230 Pac. 650.

EVIDENCE (130, 139)—DOCUMENTARY EVIDENCE—COPIES—EFFECT OF STIPULATION—AUTHENTICATION OF DOCUMENTS. Upon an issue as to plaintiff's rights, as assignor of contracts for the construction of ships, which contracts had been repudiated, it cannot be objected that a large volume of documentary evidence was inadmissible, as not properly identified or connected with the parties, and hearsay, where, to obviate technical proofs, it was all attached to a stipulation agreeing that the correspondence was had between the parties purporting to send the same, and it appeared that differently named persons were, in substance, but one party, acting for a single interest.

CONTRACTS (161)—PERFORMANCE—EVIDENCE—ADMISSIBILITY. Upon an issue as to the repudiation of a contract for the construction of ships, it is not immaterial to show the expenditures thereafter incurred by others who had taken over the work, while the repudiator remained silent and asserted no rights.

Appeal from a judgment of the superior court for Thurston county, Wright, J., entered August 13, 1923, upon findings in favor of the defendants, in an action to establish claims against an insolvent bank, tried to the court. Affirmed.

*Cosgrove & Terhune, Battle, Vandiver, Levy & Van Tine,* and *Charles S. Mackenzie,* for appellant.

*W. V. Tanner* and *John P. Garvin,* for respondents.

FULLERTON, J.—This is an action brought by the Skibsaktieselskapet Bestum III, a corporation of the Kingdom of Norway, as plaintiff, against John P. Duke, as the supervisor of banking of the state of Washington, and the Scandanavian American Bank of Seattle, as defendants, to establish against the funds of the insolvent bank in the hands of the supervisor a general claim for the sum of $400,000, and to establish against the same fund as a preferred claim the further sum of $75,000. The first of the claims is founded on the contention that the bank named, while a going concern, converted to its own use the hulls of two twin screw wooden motor vessels, the property of the as-

signor of the plaintiff. The second of the claims is founded on the contention that the fund therein mentioned was the money of the assignor of the plaintiff deposited with the bank in trust, likewise while a going concern. The cause was tried in the court below without the intervention of a jury, and resulted in a judgment in favor of the defendants. From this judgment, the plaintiff prosecutes the present appeal.

The record discloses the following facts: In the year 1917, Christoffer Hannevig, Incorporated, a corporation organized under the laws of the state of New York, was engaged in the ship brokerage business, operating generally throughout the United States and Canada. In the same year, a concern of Christiania, Norway, doing business at that place under the name of "Hannevig Bros. A/S," was desirous of having constructed for it a number of wooden hull, motor-propelled vessels, according to plans and specifications prepared by naval architects of Christiania, Norway. To that end they communicated with the New York corporation, and on receiving assurances that such vessels could be contracted for, sent the plans and specifications to that corporation with authority to enter into such contracts. The Norway concern was desirous of having the vessels so constructed as to meet the approval of the British corporation known as Lloyds, and so advised the New York corporation. That corporation submitted the plans to an agent of Lloyds and received his approval after some changes were made therein. On receiving this approval, the New York corporation entered into contracts for the construction of two of the vessels with the Anderson Shipbuilding Corporation, a corporation organized under the laws of this state having its shipyards at Seattle. These contracts were in writing, and were executed in triplicate. They were executed in the name of John Preb-

ensen in behalf of the Norway concern, who at that time was a member of the concern. His name is signed to the documents by the New York corporation as his agent. In brief, the contracts provide for the construction of the vessels by the Seattle corporation, called the builder, for the sum of $380,000 each. The contract price was agreed to be paid in instalments, the first instalment on the execution of the contract, and the remaining as the work on the vessels progressed. The contracts further provided that the builder should furnish a bond with some responsible and reliable surety company in the sum of $75,000, conditioned for the faithful performance of the work. This bond was not furnished in the form provided by the contracts, but in lieu thereof the builder procured a guarantee from the respondent Scandanavian American Bank. When this was made known to the Norway concern, it objected to the guarantee, whereupon the builder deposited with the bank the sum of $75,000 in cash to take the place of the bond required; the money so deposited being from the money paid as the first instalment due on the contract.

The communications between the Norway concern and the New York corporation had been up to this time wholly by cable messages. After the execution of the contracts, they were forwarded to Norway by the New York corporation. On their receipt by the Norway concern, they were immediately repudiated, both by it and by John Prebensen, in whose name the contracts ran. This repudiation was positive and emphatic. On receipt of the plans, the Norway concern, under date of February 4, 1918, sent to the New York corporation the following cablegram:

"No. 11:—Referring our cable 31st August 1917 we gave you authority to contract two wooden motorships contracts specifications and drawings made out

by Arnesen Christensen & Smith which you have con-
firmed we have resold same.    Have now received
copies contracts specifications drawings which have
not slightest resemblance with those made out by
Arnesen Christensen & Smith consequently we must
refuse same as you have no authority from us to accept
other ships we will not pay any further instalments.
Must also hold you responsible all claims. H. J. Hansen
account Bygdones claiming kroner 1,200,000 kroners
plus lost profit K. Einersen account Bestum 3 claiming
dollars 394,000 plus lost profit.    Please remit and we
will have all documents transferred to you.''

Under the date of the next day it sent the following
letter:

''We did Saturday morning the 2d inst. receive   .  .
.   copies of the contracts of yard numbers 8 and 9,
by Anderson Shipbuilding Corporation, Seattle.

''We also received arrangement plans and midship-
section for the Sandstrom contracts, which we im-
mediately passed on to our experts, Messrs. Arnesen,
Christensen & Smith of this town, in order to get their
view upon same and to get their expert report, as it
did seem to us, that there were large differences as
well in the contracts as in the midshipsection, which
were worked out by them and sent you for contracting.

''Enclosed we beg to hand you translated copy of
their report, from which you will yourselves see that
the contracts, which you have made up for our account
without any authority whatever from us to alter same,
as well regarding Sandstrom's number 5 and 6 as
Anderson contracts 8 and 9,—have not the slightest
likeness with the contracts made out by Messrs.
Arnesen, Christensen & Smith and sent you to New
York,—but they are quite like those contracts and
those specifications which we refused to accept from
Mr. Petersen, when he was here in July.

''Consequently, those ships which you have con-
tracted and signed are not at all ours, and we are not
going to accept same and hereby absolutely refuse to
have anything further to do with those contracts.

". . . We feel quite confident that you yourselves know absolutely best of all how awfully difficult our position has been and still is as we have sold the contracts as well from ourselves to Mr. Hansen as on account of Mr. John Prebensen to 'Bestum III,' and we are now absolutely unable to deliver the buyers what we have sold them.

"You have contracted ships on your side, which we specially and absolutely refused here.    .    .    .

"On the other hand we are very sorry that we shall have to get into difficulties with you, but nevertheless we feel ourselves not only justified, but absolutely obliged to refuse to accept the contracts, and we must, of course, keep you responsible for all losses and consequences which we have arrived at, by you having contracted other ships than we have given you authority to do.

"Regarding yard numbers 3 and 4 by Anderson Shipbuilding Corporation, Seattle, contracted as yard numbers 3 and 4, now according to later information being 8 and 9, these contracts have, as informed you in our cable of the 25th inst. number 5 been sold to A/S 'Bestum III,' represented by Mr. K. Th. Einersen of this town, for the sum of 500,000 dollars each, together 1,000,000 dollars.

"Mr. Einersen's claim amounts to about 394,000 dollars plus lost profit for account of the company A/S 'Bestum III.'

"We therefore must insist that you pay Mr. Hansen and Mr. Einersen their claims for having got other contracts than they have bought, and that you are keeping   .   .   .   Anderson Shipbuilding Corporation's yard numbers 8 and 9 for your own account.

"Awaiting your remittance we meanwhile remain
    "Yours faithfully, ·. . ."

Again on February 18, 1918, they cabled as follows:

"We have never given authority contract with Sandstrom and Anderson ships as described in contracts plans and specifications you sent us. When you go outside our authority you must of course take the responsibility. Please explain how ships could be con-

tracted without our agreement to alterations as contracts and specifications sent us have not the slightest likeness with authority given you.''

On the same day, this cablegram was confirmed by letter signed by John Prebensen in person, concluding as follows:

''We consider the whole matter very bad indeed, and think that the only reasonable thing is that you take the vessels back again, having contracted them as you have done.''

Before the contracts had been received in Norway, John Prebensen assigned his interest in them to K. Th. Einersen, who, in turn, assigned them to the plaintiff.

As indicated in the cablegrams and the letters quoted, the Norway concern had advanced to the New York corporation, to be used in the construction of the vessels, the sum of $154,000. After the receipt of the plans of the vessels, however, it refused to make any further advancements. Its efforts thereafter were directed towards obtaining from the New York corporation a return of the money advanced, and towards obtaining a refund of the incidental expenses it had incurred by reason of the contracts.

No settlement of the differences between the parties was had, and the record fails to show that the New York corporation ever formally agreed with the Norway concern to take upon itself the burden of the contracts. It did, however, in fact take them over, and either then or a short time thereafter made it known both to the Anderson Shipbuilding Corporation and to the respondent bank, which was largely financing the corporation, that it had so taken them over. The work on the vessels proceeded, and, as the instalments became due, they were met and paid by the New York corporation from its own funds. It also maintained

its own inspector at the plant of the builder, it authorized alterations in the plans of the vessels and agreed to an additional payment because thereof, and it also assumed certain obligations incurred by the builder for materials furnished and for labor performed in the construction of the vessels. In payment of the instalments alone as they became due it expended more than $350,000.

The respondent bank, as has been before stated, largely financed the Anderson Shipbuilding Corporation. Just prior to January, 1919, it was forced to advance large sums in satisfaction of laborers' liens and in satisfaction of liens filed by materialmen. In February, 1919, the Anderson Shipbuilding Corporation notified the New York corporation by letter that it could not complete the vessels at the contract price, or proceed further with the construction work on the vessels without assistance from it. On the receipt of this letter the New York corporation sent out its investigators to inquire into the situation and ascertain whether it would be profitable to complete the vessels. The report of the investigators seems to have been unfavorable to the latter cause, and the corporation concluded to expend no further sums upon them, but to sell them in their then condition for such sums as could be obtained for them. On notice being given it of this conclusion, the Anderson corporation abandoned work upon the vessels, and on April 18, 1919, notified the bank of its action, authorizing it to deliver to the New York corporation as forfeited the money it had deposited with the bank in lieu of a bond. This money the bank paid over as directed.

In July, 1919, the respondent bank purchased the incompleted vessels from the New York corporation, paying therefor the sum of $50,000. Thereafter it completed the vessels at a cost to itself which, when

added to its prior advancements, aggregated approximately $500,000. The bank was adjudged insolvent, and was taken over by the supervisor of banking as an insolvent institution on June 30, 1921. At that time there were unpaid lien claims against the vessels aggregating a large sum. These the liquidator of the bank settled, expending of the bank's funds for that purpose some $60,000.

The New York corporation was adjudged a bankrupt by the United States district court for the southern district of New York on March 18, 1921. Christoffer Hannevig, the president of the corporation, seems, as between himself and his corporation, to have taken upon himself personally the obligation to settle with the Norway concern. He was likewise adjudged a bankrupt by the district court named on May 15, 1921. After these adjudications, the Norway concern began an investigation of the affairs of the New York corporation, and learned for the first time, so one of its officers testified, that the respondent bank had taken over the vessels. The claims against the bank were filed with the supervisor of banking on November 15, 1921. The claims were rejected, and the present action was instituted within the statutory period thereafter.

Between the time the contracts were repudiated by the Norway concern and the time the claims were filed with the supervisor of banking, neither the plaintiff, its predecessors in interest, nor the agency acting in its behalf, ever communicated with the contractor who undertook to construct the vessels. All of their communications were addressed to the New York agency, and these, as we have hereinbefore stated, were directed towards a recovery of the advancements to that agency made prior thereto, and the incidental expenses that had been incurred in making the necessary preparations to take care of the contracts.

In the foregoing recital of the facts, we have drawn upon the evidence as a whole—that which was introduced by the defendants as well as that introduced by the plaintiff—and have recognized as competent and relevant much of the evidence introduced by the defendants to which the plaintiff objected in the court below and to which it objects in this court. The question of the admissibility of the evidence we will notice later.

Assuming that it is properly in the record, it would seem that argument is hardly necessary to demonstrate that the plaintiff has no ground upon which to base a recovery upon the general claim presented to the supervisor of banking. The repudiation of the contracts by the plaintiff (and in this term we include its predecessors in interest), when consented to by the other parties, became obligatory upon it. This is true whatever may be the view taken of the legality of the contracts in the first instance. If the agent exceeded, its authority when it entered into the contracts on the plaintiff's behalf, the plaintiff was at liberty to repudiate them when the excess of authority was first made known to it, as a matter of right. On the other hand, if the contracts were valid in their inception, the repudiation and consent operated as an annulment of them by agreement. There may be circumstances where a party will be permitted to withdraw from such a situation, but no such circumstances are presented here. After its repudiation of the contracts, the plaintiff remained quiescent for more than two and one-half years, without in any way indicating it still claimed an interest in the contracts. In the meantime the other parties in interest and the defendant bank acted in the belief that the repudiation was final. To allow the plaintiff now to make a change of front would cause

a loss to the bank, if the plaintiff's claims are well founded, of more than a half million of dollars. This loss could have been prevented by even a somewhat tardy notice of an intent not to be bound by its act of repudiation. Manifestly, if there were no other legal principle which could intervene, the plaintiff is now estopped from asserting claims which must have their foundation in a change of position.

The claim of the plaintiff to the money deposited with the bank in lieu of a bond is based on the theory, if we correctly understand the plaintiff, that the money so deposited was its own and was wrongfully paid over to the bank, and can be recovered on the right that a person has to recover property of which he has been wrongfully deprived from any person he may find in possession of it. But it is clear that if the legal claim it invokes in support of its general claim is correct, the principle which it here seeks to invoke is without application. If it be the fact that the contracts were valid in their inception, that they have never been annulled, and that it was the owner of the vessels at the time the bank took them over, it has no rightful claim to the fund. Under the facts assumed, the money was rightfully paid to the contractor. On the payment, it became its money absolutely. It could do with it as it pleased, and the plaintiff has no legal cause of complaint because it used it in the purchase of a bond. Moreover, it would be a strange doctrine to hold that the plaintiff has a property right in the vessels and at the same time a property right in the money it advanced for their construction. What might be the rule were it shown that a sum equal to the advancements had not been expended on the vessels at the time the bank took them over, we need not determine. That question is not here presented. The evidence is clear

SKIBSAKTIESELSKAPET BESTUM III v. DUKE.

that, at the time the bank took over the vessels, more than twice the amount of the plaintiff's advancements had been expended in their construction.

If, on the other hand, it is to be assumed that the contracts were invalid in their inception, and that the money was in consequence wrongfully paid to the contractor by the plantiff's agent, and that a part of this same money was deposited in the bank, and that it can be recovered on the theory that one may recover in specie his own property from any person he may find in possession of it, then the answer is that neither the bank nor the supervisor of banking had possession of the money at the time the demand was made for its return. The proofs are that, long prior to the demand, the bank paid out the money to the person to whom it thought it rightfully belonged, and of course it cannot be recovered in specie. Nor is the case aided by the fact, if it be the fact, that the bank wrongfully paid out the money. Under the conditions assumed, this might render it liable in damages as for a wrongful conversion, but this was not the claim presented to the supervisor which furnishes the foundation for the action, nor is it the theory on which recovery is sought.

Passing to the question of the admissibility of the evidence to which objection was made, the principal controversy is over the evidence introduced to show the repudiation of the contracts by the plaintiff. The first branch of the objection to the evidence is that the defendants did not plead in their answer a revocation of the contracts. The trial court seemingly held the evidence admissible under the general denials in the answer, and cases are cited to us which sustain its holding. But whether these represent the better opinion, we do not think we need inquire. If there was a defect in the answer it was a defect capable of cure by amendment, and this court is admonished by the

statute to consider all amendments as made which could have been made. (Rem. Comp. Stat., § 1752) [P. C. § 7336]. Under the cited section will be found our cases wherein we have applied the rule, and no repetition of them is necessary here. There are, it is true, certain exceptions to the rule, as for example, where the rule operates to prevent a party from presenting his case. But nothing of this sort is here present. The plaintiff was given all the opportunity it desired to meet the evidence.

The second branch of the objection presents a different consideration. From the nature of the case, each side desired, if in fact it was not compelled, to introduce quite a large volume of documentary evidence, the technical proofs concerning which it was difficult to obtain. To obviate the necessity of making such proofs, the parties attached together a large number of the documents and entered into a stipulation concerning them. The cablegrams and letters from which we have heretofore quoted were among the documents so attached. Concerning these, the applicable parts of the stipulation were the following:

"4. That certain letters and telegrams (of which copies are hereto attached, marked 'Stipulation Exhibits 1 to 16' inclusive) were sent by the parties therein mentioned purporting to send them, and received by the parties to whom they are addressed, on or about the dates therein mentioned. It is particularly understood and agreed that said copies are for the purposes of the trial of this action to be deemed originals. Upon these documents being offered in evidence, they shall be subject to such other objections as might be raised if the originals were presented instead of these copies.

"12. The first two payments on each vessel in the total sum of $154,000.00 were made by John Prebensen before receipt in Norway of the copies of plaintiff's Exhibits 'A' and 'B.'

"13. This stipulation (not including the attached exhibits) may at the trial of the above entitled cause be by either party introduced in evidence as evidence of the facts and admissions therein stated and made, and either party may present and offer in evidence under this stipulation either, any, or all of the attached exhibits, said offer or offers to be free from and subject to objections as provided herein.

"14. Nothing herein shall be construed as limiting either party hereto in offering for introduction further evidence herein."

The particular objections to the testimony are, (1) that the contracts for building the vessels were assigned by Prebensen to the plaintiff prior to the time the cablegrams and letters were forwarded, and that there is no showing of authority on the part of the signers of the instruments to then speak for the plaintiff; (2) that it is not shown that the John Prebensen who signed one of the letters is the same John Prebensen in whose name the contracts were executed; and (3) that the cablegrams and letters fall under the rule of hearsay testimony. But we are not persuaded that either of these objections is well founded. In the first place, the general tenor of the evidence tends to show, in our opinion, that the different parties, that is to say, Hannevig Bros. A/S, John Prebensen, K. Th. Einersen, and the plaintiff, Skibsaktieselskapet Bestum III, were in substance but one party acting for a single interest, and that, in consequence, the act of one is the act of the other. In the second place, if further evidence than the stipulation of the genuineness of the documents is necessary, it is found in the testimony of a director who testified personally at the trial. His testimony is that the plaintiff in all of its complaints went to Hannevig Bros. A/S., who in turn went to the New York corporation. The corporation thus made Hannevig Bros. A/S its agents to speak for it, and there can

be no presumption that it spoke without authority. Before this contention can prevail there must be a showing to that effect, and a further showing that the other parties in interest had notice of the excess of authority.   One of the exhibits is a letter from Hannevig Bros. A/S to Christoffer Hannevig, Incorporated, which purports to set forth all of the cablegrams that had theretofore passed between them. Certain of the cablegrams announcing the repudiation of the building contracts are included among these, and this fact furnishes the foundation for the contention that the evidence by which the defendants sought to prove the repudiation was by hearsay testimony.   But we think these were as much "copies" of the cablegrams as were any of the other instruments attached to the stipulation, and this being so, they were admissible under paragraph 4 of the stipulation quoted.

That part of the evidence showing the expenditures of the New York corporation, the expenditures by the defendant bank, and by the representative of the supervisor of banking, in the completion of the vessels, was objected to on the ground of immateriality. But it was material from the defendants' standpoint to show the injustice of permitting the plaintiff, after repudiating the contract and remaining silent for so long a period of time, to reassert rights under the contract.   The remaining objections to the evidence do not require consideration.   While we may concede that some parts of it had little bearing on the issues, this is not ground for reversal.   Ignoring it, and considering only the evidence legitimately in the record, there is sufficient to warrant the judgment of the trial court.

The judgment is affirmed.

MAIN, C. J., BRIDGES, PEMBERTON, and MITCHELL, JJ., concur.